## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| KERRY ROSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 24- |
| | ) | |
| MORGAN POLKY, TRACY CLARK, | ) | |
| MAINE DEPARTMENT OF HEALTH | ) | |
| AND HUMAN SERVICES; | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

## JURISDICTION AND VENUE

1. This action arises under 42 U.S.C. §1983, The Fourteenth Amendment to the United States Constitution; and 14 M.R.S.A. § 8101 *et seq.* (the Maine Tort Claims Act).

2. This Court has original jurisdiction of the Plaintiff's federal claims pursuant to 28 U.S.C. §§1331 and 1332.

3. This court has supplemental jurisdiction over the tort claims pursuant to 28 U.S.C. § 1367 because these claims are so related to the federal claims that they form part of the same case or controversy.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), one or more of the Defendants resides in the District of Maine and the events giving rise to the claims asserted in this lawsuit arose in this judicial district.

**FACTS**

5. In December of 2017, Kerry Ross's family was involved in a Protective Custody case initiated by Maine's Department of Health and Human Services (DHHS).

6. Kerry's minor children had been taken into protective custody and he was engaging in efforts to reunify with his children.

7. At this time, DHHS had already filed a petition to Terminate the Parental Rights (TPR) of Kerry Ross.

8. If DHHS were successful in a TPR hearing, Kerry would lose losing all custodial and visitation rights to his children, and his children would be placed in the permanent custody of another party.

9. When engaged in a protective custody matter, compliance with the rehabilitation and reunification plan developed by the parties carries significant weight in the Court's determination as to whether parental rights should be terminated.

10. The DHHS caseworker assigned to the family is the primary worker responsible for the reunification plan.

11. Pursuant to DHHS policies and procedures, the caseworker is responsible for developing the preliminary reunification and rehabilitation plan, developing and updating the rehabilitation and reunification plan, ensuring the parents receive appropriate referrals for services, completing monthly contact with parents/caregivers to review the rehabilitation and reunification plan to assess progress made and barriers to achieving goals, and facilitating and scheduling Family Team Meetings (FTMs) at least once per every three months.

12. The caseworker is required to update the plan at least once every three months, in consultation with the reunifying parent.

13. In December of 2017, Morgan Polky was a licensed social worker employed by Maine's Department of Health and Human services in the Office of Child and Family Services.

14. In that role, Morgan Polky was assigned as the caseworker to Kerry Ross' family reunification in December 2017.

15. According to DHHS policies and procedures, all contact with the family is to be entered into the Maine Automated Child Welfare Information System (MACWIS).

16. "The purpose of this documentation is to demonstrate that social work staff are having purposeful contact with families, timeframes are being adhered to, progress is being made throughout the life of the case and when closing a case, and the reasons why a family is no longer in need of OCFS intervention."

17. The narrative log within MACWIS is the primary location for documentation of contact with case members, including parents.

18. According to DHHS policies and procedures, all contact with a parent of the following type should be entered into the narrative log: face-to-face meetings; an FTM Summary Report shall be created; a summary of court events including who retains custody of the child; emails and texts relevant to the safety, well-being, and permanency of the children; telephone calls and evaluations or other reports related to a parent's progress.

19. Decisions that change visitation schedules are to be entered by the supervisor every three months or sooner as necessary or when there are changes.

20. According to DHHS policies and procedures, the policies and procedures exist to protect the fundamental right of parents to direct the care, upbringing and education of their children as well as protect the child's fundamental right to bodily integrity.

21. In December of 2017, Morgan Polky initiated communication with Kerry via text message, using her state-provided cell phone.

22. Initially, the communications between Polky and Ross were limited to logistical messages regarding services and updates regarding the children.

23. Between December 19th, 2017, and December 28th, 2017, Polky and Kerry exchanged approximately 20 text messages regarding the logistical support Kerry needed to comply with the reunification plan.

24. These messages were logged as a single telephone call in the narrative log dated December 28, 2017.

25. DHHS has a policy of contracting with a third-party transportation services provider to provide case-related transportation services.

26. For a parent to access this service, the caseworker must provide a referral with the parent's schedule at least 48 hours in advance.

27. Between December 29, 2017, and January 6, 2018, Polky and Kerry engaged in approximately 30 text messages regarding his appointment schedule and the referrals he needed for transportation.

28. Neither the text communications, nor the referral was documented in the narrative log.

29. On January 6, 2018, Polky told Kerry she would encourage "our lawyer" (the Assistant Attorney General handling the case) to continue the TPR hearing allowing Kerry to have more time to demonstrate compliance with the reunification plan.

30. Neither the text communication with Kerry nor the purported communication with the AAG was documented in the narrative log.

31. On January 8, 2018, and January 9, 2018, Kerry texted Polky regarding several rides he needed referrals for, and expressing frustration that the rides were not consistent which was negatively impacting his ability to make progress with the reunification plan.

32. On January 16th, 2018, through January 19th, 2018, Kerry sent several texts to Polky regarding the transportation services he needed Polky to schedule for his upcoming appointments.

33. None of these text messages were included in the narrative log.

34. Through this date, caseworker Polky had told Kerry that she would advocate for him, that her supervisor trusted her and that if he worked with her, he could make great progress on his reunification plan.

35. On January 19, 2018, Polky met with Kerry, the resource family, and the children.

36. During this meeting, Polky and Kerry discussed setting up overnight weekend visits with Kerry and the children.

37. Per DHHS policy, the decision to change the visitation schedule should be discussed during an FTM, and any changes to the visitation schedule should be noted by the supervisor in the narrative log.

38. The visit was entered into the narrative log, but there was no notation regarding a potential modification of the visitation schedule.

39. Polky texted Kerry after the in-person meeting, on January 19, 2018, and referred to mutual acquaintances that she and Kerry had in common.

40. Approximately 25 messages were exchanged, around 8:00pm, regarding mutual acquaintances who were unrelated to the case.

41. Around 8:00pm on Sunday, January 21, 2018, Kerry and Polky exchanged approximately 40 text messages regarding modifying the visitation schedule with the kids, Kerry's upcoming court and treatment schedule, and setting up the ride referrals for transportation.

42. Polky also discussed the need to start drug testing Kerry.

43. Polky explained that the tests needed to be "random" but she needed to know his schedule so she could schedule transportation to be ready to take him to the tests when they were scheduled, even if she wasn't telling him when they were scheduled.

44. On January 22, 2018, Polky and Kerry engaged in approximately 45 text messages regarding the new visit schedule with the kids, the rides that Kerry needed authorized as well more personal details about Kerry's family and interpersonal dynamics within his family.

45. On January 23, 2018, Polky and Kerry exchanged over 100 text messages.

46. During this conversation, they discussed logistics of the case in terms of Kerry's progress toward his reunification plan.

47. They also discussed Kerry's concern that the previous caseworker was still discussing the case with the resource family.

48. Polky expressed concern about the continued communication texting, "I'm sorry ur past workers didn't take the time to get to know you."[1]

---

[1] In the interest of accuracy and completeness, text messages have been transcribed as written and have not been modified for spelling or grammar.

49. On January 23, 2018 the Guardian Ad Litem assigned to the children, emailed Polky, Polky's supervisor and the AAG assigned to the case requesting discovery regarding Kerry's progress writing "objective documentation of Dad's recovery would be helpful before the children begin overnights."

50. On January 24, 2018, Kerry texted Polky that the transportation request for that day didn't go through, so he didn't have a ride home from his appointment in Lewiston.

51. Polky texted that if she had been available, she would have picked him up, but offered to get him a gas card to reimburse his family member for picking him up.

52. Polky indicated that her supervisor would leave a gas card at the DHHS office for him.

53. A family team meeting had been scheduled to discuss the potential change in visitation, but Polky cancelled the FTM.

54. Polky and Kerry engaged in about 100 text messages about the FTM that had been cancelled and the various points of view of people involved in the case.

55. Polky told Kerry that her supervisor "supports our weekend visits.  I think [the Guardian Ad Litem] will push back but we're doing it regardless."

56. Polky texted Kerry that "I do care a lot.  I'm just glad to finally have a parent to work with who truly wants their kids back and is working hard.  Parents like you are rare these days."

57. Polky sent other messages disparaging the system and how it harms dads.

58. None of the above text messages were included in the narrative log.

59. The purported conversation with her supervisor regarding the change in the visitation schedule was not logged in the narrative log.

60. DHHS policies and procedures require the caseworker to conduct a site visit to approve any location in which the children will be spending time.

61. If any such safety assessment was conducted by Polky, it was not included in the narrative log.

62. Another FTM was scheduled for January 25, 2018 during which the change in visitation schedule would have been discussed.

63. On January 25th, 2018, Polky texted Kerry at 5:50am indicating that the family team meeting that was scheduled for that day was cancelled because she didn't feel well.

64. She made plans to meet with Kerry the following day while he was engaging in his reunification services.

65. At 5:58 am, she confirmed via text, that Kerry would "have the kids all weekend : )"

66. The decision to modify the children's visitation schedule was not included in the narrative log.

67. Later the same morning, Polky texted Kerry, asking him to ask his recovery providers to send the most recent information about his services.

68. Kerry texted Polky that the Gaurdian Ad Litem had called him with a list of concerns about the location for the weekend visits with the kids an indicated her surprise that weekend visits were scheduled.

69. Polky's response was "Lol why, what is she worried about?"

70. Kerry indicated concern that someone must be saying something about his safety with the children, to which Polky responded, "lol, must be."

71. Polky then shared communication that had been sent to her by another member of the case regarding that person's concerns with Polky's handling of the case.

72. Polky engaged in discussions with Kerry about the family dynamics and the history between all the parties.

73. On Friday, January 26, 2018, Polky texted Kerry asking if he was ready to get the kids after school to which he replied he was ready.

74. Polky admitted that she didn't know that it had been so long since the last overnight he had had with the children.

75. Throughout the course of the weekend, Polky and Kerry engaged in hundreds of text messages about the progress of the weekend visits with the children.

76. During this conversation, Kerry admitted to being nervous about the visits in the context of the case and said that "I'm talking to you and done listening to everyone else."

77. Polky encouraged this viewpoint texting, "oh well I don't get too caught up in rules.  As long as the kids are safe and well cared for.  Just do what works for you and don't talk a lot about it with them."

78. In this message thread, she is encouraged Kerry not to talk to the resource family, or the guardian ad litem about the weekend visit, saying "they don't need the play by play of your visits" and that she would "let [the guardian ad litem] know that I checked in through the weekend to calm her down a little lol."

79. Polky then offered additional services for which she could make referrals and said that they should meet up in person to set up the services.

80. According to the DHHS policies and procedures, such services would require authorization from the supervisor of the case.

81. These text messages continued consistently from the morning of January 26th through Sunday January 28th at 10:30pm.

82. None of the above messages were entered into the narrative log for the case.

83. On January 29th, 2018, Kerry texted Polky with a series of changes to his schedule he needed conveyed to the transportation services provider.

84. He also followed up with the request to meet in person to continue working through the referrals.

85. That evening, around 8:45pm, Polky texted Kerry asking for an update regarding the visit with the children earlier in the day.

86. Kerry indicated that it went well.

87. Polky then disclosed confidential information received from other parties in the case.

88. Polky discussed the children's mother's information, even though that information was not relevant to Kerry's progress in reunification.

89. Polky shared her negative opinion of the other parent with Kerry.

90. Polky texted that "It's been a very long time since I've come across a dad who seems so genuinely determined to turn life around for the kids.  I just hope you're not just talking the talk. But so far you've proved that it's not just talk so that's why I've advocated for you"

91. Polky then agreed to meet up in person on both Thursday and Friday of that texting, "I'm glad you know you can talk to me and not be judged."

92. Polky indicated that "not all social workers are passionate about their job maybe that's why" and "some are better than others."

93. On Wednesday, January 31, 2018, Polky texted Kerry referencing an article that she had read about Kerry's previous criminal charges and asked about the veracity of the article.

94. Kerry asked if they could talk in person because it was too much to talk about in text format.

95. On Thursday, February 1, 2018, Kerry texted Polky indicating that he was willing to talk about the past situation, but he wanted to do so away from his family.

96. Polky agreed to pick him up and take him to a coffee shop, the next day.

97. That in person meeting did not happen, but they spoke on the telephone.

98. During this conversation, Kerry shared many details about his family and the various dynamics at play in the case.

99. Kerry shared details about his personal life including being the victim of sexual assault at a young age, and details about the trauma he sustained as an adult while incarcerated.

100.    They continued the conversation via text message, sending dozens of messages between 5:30pm and 8:56pm during which Kerry continued to share personal details with Polky.

101.    Polky texted that she was researching housing options for Kerry and that she thought he would obtain housing soon and "I think we could probably convince someone that there won't be issues" and that she "contacted someone I know who has some connections."

102.    At this phase in reunification, Kerry believed that the remaining barrier to successfully reunifying with his children was his lack of housing.

103.     Kerry believed this was a very positive step and responded via text message expressing his excitement.

104.    Polky asked him if he would need things for the house and texted that she always has people donating things so she will keep him in mind.

105.     Polky indicated that they should still meet up in person to work on the housing applications.

106.     Kerry texted that, "if we can make headway on some of the things needed to be done? Then yes.  If you need time to get that in order let's wait till then."

107.     Polky indicated that she would come by in person at the end of the day on Friday so she could see the kids and meet with Kerry.

108.     On the morning of Friday February 2nd, 2017, Morgan texted Kerry asking him to call her to coordinate some information for housing.

109.     They also discussed Kerry's transportation needs for the following week.

110.     Later that day, Polky texted that the transportation for Monday had fallen through but that she would "clear her calendar and bring" him to his appointments.

111.     At the end of the business day, Polky visited Kerry and the children at the resource parent's home.

112.     None of the above text messages, nor the in-person visit with Kerry, the children or the resource parent were entered into the narrative log.

113.     That evening, around 8:00pm, Polky initiated another round of text messaging letting Kerry know that he could take the kids outside of the house that weekend to do something, instead of staying in all weekend.

114.     She continued the conversation by texting information about what another case participant thought about the case.

115.     She again texted that "it's really refreshing working with a parent who is motivated.  I'll do whatever I can to help."

116.     The morning of Saturday February 3, 2018, Polky texted Kerry indicating that she needed some more paperwork from him.

117.     The evening of Sunday February 4, 2018, Polky texted Kerry confirming that he still needed a ride for his Monday appointments, to which Kerry responded affirmatively.

118.     Polky continued the conversation by asking how the weekend visit with the children went and texting, "[s]orry if I got [the Guardian ad litem] mad."

119.     Polky continued the conversation by again bringing up their mutual friend and asked Kerry if it bothered him that they knew the same person.

120.     She texted, "I don't think it will impact anything but if I know someone a client knows then I like to be sure to give them an option of working with me or not."

121.     Kerry responded that he was ok with it.

122.     They continued to discuss Kerry's past experiences with caseworkers and that he felt Polky was the first one who hadn't treated him poorly.

123.     Polky texted that she was going to give him a list of things she needed from him for him to obtain housing.

124.     Kerry said he would accomplish those tasks "as soon as is humanly possible.  My kids and i having a home and getting them back is what I am focused on."

125.     On February 5, 2018, the Guardian Ad Litem again emailed Morgan Polky, her supervisor and the AAG handling the case requesting documentation of Kerry's progress.

126.     The Guardian expressed concern that the decision had already been made to grant weekend visits between Kerry and the children but indicated that she would still like to see objective proof of Kerry's progress.

127.     On February 5, 2018, Polky picked Kerry up at his home in her state-provided

vehicle, drove him to his case-management appointment, picked him up from that

appointment, drove him to his individual counseling appointment, from that appointment

to a drug test, and then back to his residence.

128.     During the extended time in the car, Polky told Kerry that her supervisor trusts

her, that she can do whatever she needs to do in the case and that she will continue

advocating for Kerry.

129.     During these conversations, Kerry understood Polky to be telling Kerry that if he

did what Polky wanted, she would influence the case in his favor by providing needed

services, making visitation changes in his favor, and using her supervisor's trust in her to

make decisions without oversight.

130.     On that same day, she texted Kerry that his case manager did not need to complete

the BRAP housing application with him, as she, Polky, had it "covered."

131.     That evening, Polky texted Kerry that the transportation request for the next day

may be "messed up" and "if worse comes to worse and it can't get fixed for tomorrow I

could probably give you a ride."

132.     The next morning, Kerry texted Polky his case manager's contact information and

asked Polky to contact her.

133.     Polky texted that she was unable to reach his case manager but left a message

with instructions about what she needed.

134.     Another FTM had been scheduled for that day, but Polky texted him that she had

rescheduled it.

135.     On the afternoon of February 6, 2018, Polky again gave Kerry a ride from his drug test to his visits with his children.

136.     This interaction was logged in the narrative log.

137.     Later that afternoon, she texted him a photo of the negative drug test she had received from February 5, 2018.

138.     Kerry requested that his drug tests be supervised so that no one could question the outcome as he knew maintaining sobriety was a key component to his successful reunification.

139.     The drug test result was not logged into the narrative log.

140.     On February 7, 2018, Polky requested that Kerry text her with all his upcoming appointments so she could sort out transportation requests.

141.     She made him aware of an additional appointment one of his children had, to which Kerry requested that transportation be scheduled, and said that "if I had a ride I'd never miss anything.  EVER."

142.     They continued to discuss ways to solve his transportation needs, and how he could possibly afford a vehicle of his own.

143.     Polky texted Kerry a picture of a handwritten list of items he needed to accomplish.

144.     None of this communication nor the list was entered into the narrative log.

145.     On February 8, 2017, Polky texted Kerry that he will have to see her in person to sign releases.

146.     She texted that she would advocate for taking the TPR off the table but he will have to "sign all of my releases."

147.	Kerry responded that there would be a family team meeting the next day and he could sign the releases then, to which Polky responded that she "didn't think we were still doing the ftm."

148.	On February 9, 2018, Polky texted Kerry some additional appointments and inquired about transportation needs.

149.	Polky told him that the reunification efforts are "going to take up pretty much all of you, I've really had to push hard to get you this extra time so we have a lot to prove."

150.	They continued to send hundreds of text messages over the course of that day.

151.	During that conversation, Polky said that "I don't go out of my way and put in extra effort and time for people unless I believe in them."

152.	Polky brought up a second mutual acquaintance of theirs, and texted Kerry that she had disclosed to that person that she was Kerry's caseworker.

153.	Polky and Kerry continued to share text messages about mutual friends and personal information about Kerry.

154.	She joked that with their mutual contact, "makes me worry a little about what you've heard about me lol."

155.	After additional text messages, Polky suggested that she would pick him up on Monday so they could continue working on things in person.

156.	She also texted that "Got u at the top of our housing list btw."

157.	She texted that "we need to fill out the app on Monday but I sent my bosses boss a long email about you and she replied she'll take my word for it and put you at the top."

158.	The morning of Saturday, February 10, 2018, Kerry texted Polky to tell her that he had completed the section 8 application.

159.     Morgan texted back that "Crazy that we would have been walking into a court room this month to terminate your rights and now we're discussing "when" the kids return to you.  Someone's looking out for you that's for sure."

160.     They continued to have an ongoing conversation during which she texted that "I just see something in you and when I believe in things I fight for them… I still don't think u fully trust me but I hope some day you do."

161.     Kerry continued to disclose more personal information about his life experiences via text message including trauma that was inflicted on Kerry while he was an inmate in the state prison.

162.     Eventually, Polky asked Kerry how the kids were that day and they discussed logistics about the children's schedules.

163.     Polky told Kerry she would sign him up for parenting classes, but the good ones, "I don't view you as my typical crappy client who I throw in those classes so I want to be sure it's beneficial."

164.     Polky then asked Kerry about a series of people unrelated to the case and whether he knew them, solicited personal details about the people and asked Kerry's opinion.

165.     Polky then disclosed that one of the people she had been asking about had been messaging her personally, in a dating context.

166.     Thinking this was some sort of test of character, Kerry responded by asking how much more he needed to do to prove he was trustworthy.

167.     Polky told him that intitially she was scared of him based on what she had read in the file, but she wasn't "as scared anymore."

168.      She asked him if there are more men like him and told him "ur an interesting person."

169.      She told him that "I like talking to U ur different and interesting."

170.      Later in the conversation she asked Kerry whether he lets people into his phone to which he responded that it's locked with a code.

171.      She continued the conversation texting that "you're very intriguing and u don't fit into that small town crap… from my perspective."

172.      She texted that "Someday I'll tell you part two of my confession lol."

173.      She asked him about details of a sexual nature regarding some of the mutual acquaintances they had.

174.      After discussing one of the third parties, she texted Kerry that she would stop dating that person and Kerry texted her that she deserved better than that person.

175.      She continued to ask about other mutual acquaintances and whether he talks to them about his private life, to which he responds in the negative.

176.      She texted "ok good.  It's not so much u I'm worried about but other people.  I've taken a risk too, trusting and talking to you more than I talk to most people I work with."

177.      She asked him about what he knows about the Lewiston attorneys on the parental rights roster and sent him a list.

178.      Kerry told her that one of their mutual friends could tell that she was his caseworker based on a social media post Polky had made.

179.      Polky admitted that she had posted about an experience with "one of the dad's" she was working with, and the mutual acquaintance could tell it was Kerry.

180.     She asked Kerry what he does at the house when the kids go to sleep, to which he responded, "work out, watch movies, be bored to death."

181.     She asked Kerry if the resource parent knew they were texting today, to which Kerry responded, "do I look stupid to you?"

182.     Polky responded that "I want to know more about you."

183.     Polky texted that she "would like talk more in person soon."

184.     On the morning of February 11, 2018, Morgan Polky messaged Kerry saying, "whoa I guess I shouldn't text with u right before bed," that she had "crazy dreams" and asked whether he had tattoos, texting "in my dream u were covered in them that's y I ask."

185.     During this conversation she texted that "[w]ell I know you have to talk to me to some extent because I'm your case worker but I mean you don't have to talk to me to this degree and I don't want u to think u have to just because I'm ur worker and u have to impress me."

186.     She followed this up with "I don't talk because I'm bored or because I'm looking to get info out of you.  Your very insightful and you have a depth to you that not many men have.  And ur kind of wise and fascinating.  Ur a rare breed lol."

187.     She continued to discuss her views on men, and her past personal relationships.

188.     During this ongoing conversation she texted "I'm aware of what you can do to me" to which Kerry responded, "[a]s am I aware of what you can do to me as well."

189.     She then asked if any other woman had access to his phone plan and could "access all of your texts and stuff.  Some women r nuts.  I can trust u all day but I'll never trust another woman."

190.    When Kerry responded that no one did she texted, "good. U already know all this I'm sure lol I just like to cover all bases."

191.    She then texted "U think sometime we could talk like this in person."

192.    She followed this text message, with a message confirming that they were meeting the next day to fill out the housing application.

193.    They continued to message throughout the course of the day sending hundreds of messages.

194.    During one exchange Polky texted that she "was looking to see a pic of [his] tattoos and [she] couldn't find anything."

195.    She continued to share personal information about her own children, her divorce and they discussed details of Kerry's case.

196.    She asked Kerry if his current relationship was serious to which he answered, "[g]etting my kids back is what I'm serious about."

197.    Later in the day she texted "Sry if I asked or said too much" to which Kerry responded, "[l]et me guess because I haven't texted you think you did something that made that happen?"

198.    He texted that he was busy with the kids and a few errands but they agreed to have coffee the next day after his appointment.

199.    She asked how much time to block off and he responded that he wanted to get stuff done for the case.

200.    On February 12th, 2018, they sent multiple text messages to each other about the housing application, and Kerry's transportation.

201.    They met in person in her vehicle and filled out applications and paperwork.

202.      Polky told Kerry he didn't need to take the drug test, that she would take care of it.

203.      Kerry understood Polky to be insinuating that she wanted to spend the time allotted for his drug tests with him and she would submit negative tests.

204.      That evening she texted, apologizing for meeting her in car and saying that she didn't want him to think she was "hiding him or something."

205.      On February 13th, 2018, Polky texted Kerry a picture of the letter she wrote confirming his homelessness which would put him further up the waitlist for housing.

206.      He responded by texting Polky several pictures of his children by which he meant to convey that he was busy with his children.

207.      That evening, around 8:30 pm, Polky texted a profile of a potential clinician for Kerry.

208.      The following morning, the morning of February 14, 2028, Polky texted Kerry a listing for a parents' group.

209.      She also texted him a photo of the negative drug test result she implied she would add to the case.

210.      None of the above text-message communications were logged in the narrative log.

211.      The negative drug test was not logged in the narrative log.

212.      On Thursday February 15, 2018, Polky sent a screenshot of a private facebook messenger conversation between two parties unrelated to the case.

213.      On February 16, 2018, Polky sent a screenshot of a male's facebook profile and asked Kerry if he knew him, to which Kerry responded with a picture of his kids.

214.     On February 17, 2018, Polky texted a lengthy message about her past relationship with her ex-husband.

215.     In the same conversation she texted Kerry that "it was sex dream" that she had had about him.

216.     She then texted sexually explicit details about the dream and described it occurring in her car and in her office.

217.     She continued to engage in a sexually explicit conversation with Kerry that lasted over a series of 100's of text messages and multiple weeks.

218.     Kerry understood that he was to participate in these conversations to continue to receive favorable treatment in his case.

219.     Amidst these explicit conversations, Kerry continued to express fear about his own case, Polky continued to discuss logistics of Kerry's case and continued to discuss other details of her job as a caseworker.

220.     During one portion of the conversation, Kerry declined to engage stating that he had the kids at home.

221.     Despite this, Polky continued to persist in engaging him in a sexually explicit text conversation.

222.     Polky texted sexually explicit nude photos of herself to Kerry and requested that he do the same.

223.     Kerry understood that he was expected to send explicit photos in return to continue to receive favorable treatment in his case.

224.     During another occasion in which Kerry tried to disengage from the conversation, Polky reacted negatively.

225.     The next morning, February 18, 2018, Kerry asked her questions about childhood development with respect to questions he had about parenting.

226.     When Kerry did not engage in the conversation to the level Polky expected, she told him he was "not very chatty today" to which he replied that he was with the 3 kids.

227.     They then continued to engage in a number of text messages with respect to the logistical help Kerry needed for the services included in the reunification plan.

228.     Over hundreds of messages on the 18th, Kerry continued to seek reassurance about how long it would take to receive a housing voucher, and Polky continued to turn the conservation back to their "relationship" and sexually explicit topics.

229.     On another occasion in the conversation, Kerry discussed his transportation needs, and asked questions about how to afford a vehicle and Polky responded by asking Kerry if he still had her pictures on his phone.

230.     He responded that he did not and continued to discuss the logistics of his case.

231.     Polky texted that she will pick him up on Tuesday to "get some work done" then asked, "U still up for hanging out some time."

232.     When Kerry did not immediately respond, Polky texted "alright well have a good night."

233.     Kerry texted back that he was with his kids and to "stop w the dramatics."

234.     The conversation later turned back to working on the housing voucher.

235.     Polky texted Kerry that "I also just had dinner with a friend who is in the field and she gave me some info on this program called wrap around funds that help pay for so many things like transportation (cars), furniture, medication and she emailed me the app for it."

236.     Around 8:00pm that evening Polky texted confirming that the GAL had not come to Kerry's residence that evening, and saying "so now u can answer my question" to which Kerry responded, "no."

237.     She texted that he was not being very nice and that she was "probably not the right person to be a dick to."

238.     He called her "sensitive" and told her he was with his baby.

239.     She continued to demand explicit photos of him to which he responded, "dealing w babies. Ttyt."

240.     On February 19, 2018, Polky texted with Kerry about picking him up at his house and telling the related parties it was "for a drug test" and Kerry asked if "that's what they're doing from now on?"

241.     Kerry understood the expectation to be that Polky would pick him up, ostensibly for a drug test, they would engage in sexual acts, and she would submit a negative drug test result.

242.     Throughout the course of that day Polky continued to send sexually explicit text messages and demanded Kerry do the same.

243.     He texted that he "didn't feel like it" and described the financial pressures he was feeling regarding complying with his reunification plan.

244.     On February 20, 2018, after sending text messages all day, Polky picked Kerry up in her work vehicle to take him for a drug test.

245.     While in the vehicle at 3:00pm, Polky initiated sexual contact with Kerry, by touching his clothed penis with her hand and by telling him she wanted to have sex with him.

246.      Kerry rejected her advances claiming that he was in a relationship and did not want to cheat.

247.      Polky was upset at being rejected and engaged Kerry in a lengthy conversation about her expectation that things would turn physical.

248.      Later in the evening, Kerry asked her "how can you be mad that I don't wanna cheat or be shady."

249.      Polky texted that she was embarrassed because she thought he "wanted to actual hook up.

250.      Kerry responded that "I just don't want to cheat.  I know a felt a certain way texting and it's a red flag that I'm not doing the right thing and need to make sure I do."

251.      She continued to send texts about feeling rejected and being upset that he rebuffed her actions.

252.      During the barrage of text messages about the encounter, Kerry asked her to "hold on for a few" to "relax" and that "I'm trying to deal w the kids and think.  I don't play games."

253.      When Kerry attempted to disengage from this topic of conversation, Polky reverted to discussing details of the case.

254.      The morning of February 21, 2018, Polky initiated a series of text messages discussing Kerry's upcoming schedule.

255.      Kerry responded, "when I get my schedule I'll let you know."

256.      Polky then turned the discussion personal, again, asking if something was wrong, and texting that she was "just trying to do my job."

257.     Kerry responded to her to "stop pretending to do your job just so you can gauge where I'm at emotionally."

258.     Polky then asked him when he could do a drug test and told him she would pick him up.

259.     That evening, Polky texted Kerry saying she hopes they can move forward in a "professional way" and continued to send texts about her feelings.

260.     At 6:45am on February 22, 2018, Kerry responded "ok".

261.     Polky texted him a series of questions about the case to which Kerry asked her to wait because it was before 7 am and he had the 3 kids.

262.     At 9:00am, Kerry responded that he was ready to engage with the logistical discussion about his case.

263.      She also texted him that she spoke with her supervisor and thinks he'll be approved for $500 toward a car.

264.     She texted him a photo of a negative drug test dated February 20, 2018.

265.     This test was not entered into the narrative log.

266.     Polky asked for access to Kerry's cell phone.

267.     Kerry told her that it bothered him and "It felt like because I didn't wanna hook up that you have been treating me different.  And honestly that hurts.  Yes, I've been to jail and made poor decisions.  But I'm truly trying to be a good person and I thought you would respect that.  Not treat me that way."

268.     She responded that she took a risk and felt insecure.

269.     She then shifted gears texting that she had some leads on cars and asked if he was interested in checking out a few cars the next day.

270.     He said that he would welcome the help but wanted "to be cool" about their situation.

271.     On the morning of February 23, 2018, Polky cancelled their in-person meeting to look at cars.

272.     Kerry told her he is stressed and asked her to give him a few moments.

273.     Polky continued to engage in conversation throughout the course of the day and Kerry told her that he had to pick up his daughter from school.

274.     Polky asked to meet in person and talk and he responded, "I got the babies."

275.     Polky continued to try to discuss their "relationship" to which Kerry responds "I want everything back to normal.  I have to feel one wrong move and I'm done."

276.     He asked Polky to leave give him space, texting, "cause your not my girl your my caseworker and I'm watching kids and need space."

277.     She continued to ask for time to discuss the situation and he responded "I would be your friend I just have boundaries where you don't and it's uncomfortable.  I'm not trying to be mean.  I'm gonna take care of the kids now."

278.     Polky again asked him to call her and he responded, "[n]ooooooo please stop."

279.     Instead of respecting his request, she called him and he did not answer.

280.     Polky then texted that the housing application needed to go to his case manager instead of her and she would have to fax it the case manager the following Monday.

281.     She then sent dozens of text messages about their "relationship."

282.     On Saturday, February 24, 2018, Polky sent messages asking about the children.

283.     When Kerry responded, she then sent multiple messages about their "relationship" to which Kerry responded that he does not want to talk and that he has "too much going on to lose focus."

284.     After multiple text messages, Polky reverted to discussing the case and asks if he's ready for another "to-do" list.

285.     She sent him a photo of the list and told him to let her know if he wanted any help.

286.     She asked him "what about ur drug test this week how do u want to do that?"

287.     She texted "Which day do u want me to bring u for a test, mon or tues? I'm not really supposed to let u choose but I know ur clean…" to which Kerry responded that he'll let her know later.

288.     Kerry understood this request to mean that Polky expected him to meet her in person and engage in sexual conduct in her vehicle.

289.     Multiple hours later, Polky texted Kerry to ask how people use suboxone, to which he did not respond.

290.     The next day at approximately noon on Sunday February 25, 2018, Polky texted Ross a series of profile pictures and asked if he knew any of the people.

291.     Polky asked if the GAL dropped in over the weekend, and texted about how she bet that none of the people in the case ask how they can help Kerry with reunification.

292.     Polky messaged that she cares and wants to help.

293.     She texted that he should "check his rides to make sure no one screwed with them over the weekend" and that he's "gotta do some parenting classes soon before court because it's on your reunification plan if u need help with getting set up let me know."

294.     Kerry texted that he had sick kids and that's why he wasn't responding.

295.     The morning of February 26th, 2018, Polky texted Kerry that she needed to go over his reunification plan and meet up to have it signed for court.

296.     Kerry texted that he was in counseling and Polky responded by indicating that she thought he was already done with counseling.

297.     Polky asked him to call her because "we need to talk about court" and "some stuff you've gotta do asap Talked to the state attorney this morning" and that he should "get ahold of me if you want to get this stuff done…"

298.     On February 26, 2018, Kerry agreed to accept a ride to a drug test from Polky.

299.     While in her government-provided vehicle, Polky again initiated sexual contact with Kerry.

300.     Kerry acquiesced, believing he needed to do so to receive beneficial services in his case.

301.     Kerry and Polky engaged in sexual intercourse.

302.     Kerry would not have engaged in any sexually explicit conversations, the sharing of sexually explicit photos nor engaged in sexual activity with Polky had he not been afraid of the negative consequences that Polky could inflict on his reunification efforts with his children.

303.     Polky's incessant demands for contact only stopped when Kerry reported her actions and requested that a new case worker be assigned.

304.     As a caseworker, Polky understood that Kerry's history of trauma made him more vulnerable to sexual assault.

305.     As a caseworker, Polky knew that the intense pressure to succeed with the reunification plan made Kerry vulnerable to overreach.

306.     As a casework, Polky knew that Kerry could not consent to any type of sexual relationship with her.

307.     As a caseworker, Polky knew it was a violation of her licensing rules and code of ethics to engage in any type of sexual relationship with a client.

308.     As a result of Polky's actions, Kerry suffered a relapse, from which he has recovered and a diagnosis of post-traumatic stress from which he still suffers.

309.     The reunification efforts with his children were significantly delayed because of Polky's direct harm to Kerry, and the need for another caseworker to be assigned and take over the family's case.


## COUNT I, BATTERY

310.     Plaintiff re-allages paragraphs 1-309.

311.     Morgan Polky subjected Kerry Ross to physical contact of a sexual nature.

312.     Morgan Polky's physical contact with Kerry Ross was an of offensive nature.

313.     Kerry Ross suffered offense when she contacted him in that manner.

314.     Under Maine Law, a client cannot consent to sexual conduct with a caseworker.

315.     Polky committed the crime of gross sexual assault when she engaged in intercourse with a client.

316.     Polky committed the crime of unlawful sexual contact when she engaged in sexual touching with a client.

317.      Polky used and abused her position of power over Kerry to coerce him into engaging in sexual contact and intercourse to which he did not consent.

318.      As a result of Defendants' conduct, plaintiff has suffered permanent physical injury, pecuniary losses, emotional distress and other damages, both compensatory and punitive, for which he seeks compensation.

## COUNT II ASSAULT

319.      Plaintiff realleges paragraphs 1-318.

320.      Morgan Polky engaged in a course of relentless communication and sexual harassment against Kerry Ross.

321.      Morgan Polky used her power as the caseworker to orchestrate situations in which she and Ross were alone.

322.      This conduct created a reasonable apprehension in Kerry Ross that he would be sexually assaulted.

323.      As a result of Defendants' conduct, plaintiff has suffered permanent physical injury, pecuniary losses, emotional distress and other damages, both compensatory and punitive, for which he seeks compensation.

## COUNT III 42 U.S.C § 1983

324.      Ross re-alleges paragraphs 1-323.

325.     This is an action at law against the Defendant, State of Maine Department of

Health and Human Services, and Morgan Polky, to redress the deprivation, under color of

law, rights secured by Kerry Ross by the Fourteenth Amendment to the United States

Constitution and 42 U.S.C. s 1983, for deprivation of his right to be free from sexual

assault.

326.     Morgan Polky violated Kerry Ross' Fourteenth Amendment right to bodily

integrity and to be free from sexual assault.

327.     Polky acted under the color of law when she used her position of power over

Kerry and his family to engage in a systematic pattern of grooming Kerry with the

ultimate result of coercing sexual contact with Kerry.

328.     At all times material, Morgan Polky was working as a caseworker employed by

DHHS.

329.     Morgan Polky contacted Kerry on her State-provided cell phone.

330.     Morgan Polky sexually assaulted Kerry Ross while in a State-provided vehicle.

331.     Morgan Polky acted pursuant to the authority she possessed over Kerry Ross by

virtue of being a state-employee assigned to oversee his family's reunification process.

332.     Morgan used her ability to both produce and withhold results in Kerry's

reunification plan to influence Kerry's conduct toward her.

333.     Morgan told Kerry she was able to act with impunity due to her supervisor's

policy of letting Morgan handle her cases how she wanted.

334.     Morgan reinforced this belief by obtaining beneficial results for Kerry's

reunification.

335.    Morgan Polky was able to illegally coerce Kerry Ross into engaging in sexual conduct specifically because of the power she wielded over him as the caseworker assigned to his family in a protective custody case in which a TPR had been filed.

336.    As a result of Defendants' conduct, plaintiff has suffered permanent physical injury, pecuniary losses, emotional distress and other damages, both compensatory and punitive, for which he seeks compensation.

## COUNT IV SUPERVISOR LIABILITY

337.    Ross re-alleges paragraphs 1-336.

338.    At all times material to the complaint, Tracy Clark was employed by the Maine Department of Health and Human Services Office of Child and Family Services.

339.    In this capacity, Tracy Clark was Morgan Polky's supervisor.

340.    Tracy Clark failed to adequately train, supervise or control Morgan Polky.

341.    By allowing Morgan Polky to act with impunity, Ms. Clark showed a reckless or callous indifference to the rights of others.

342.    Ms. Clark is aware that the OCFS is responsible for the safety and well-being of the individuals in their custody.

343.    Ms. Clark is also aware of the vulnerable state parents are in when they are working through a reunification plan.

344.    Ms. Clark is aware of the power imbalance between caseworkers and clients.

345.    The policies and procedures of the DHHS OCFS are designed specifically to protect the vulnerable families working with DHHS.

346.     If Ms. Clark had responded to any of the concerns raised by the Guardian Ad
Litem, she would have realized that there was no documentation in the narrative log
about why the visits with the children were changed, there was no documentation in the
narrative log about a safety check to the site of the proposed visits, and there was
minimal documentation about Kerry's progress.

347.     Had she sought out the information requested, she would have been privy to the
thousands of text messages between Morgan Polky and Kerry Ross.

348.     Ms. Clark would have seen that the communication was crossing boundaries and
would have been in a position to address Polky's behavior before it escalated to sexual
harassment and sexual assault.

349.     The policies and procedures are designed to protect the vulnerable population
DHHS serves from violations of constitutional rights.

350.     Ms. Clark showed a reckless indifference to the rights of others by knowingly
allowing Morgan Polky to violate DHHS policies and procedures.

351.     As a result of Defendants' conduct, plaintiff has suffered permanent physical
injury, pecuniary losses, emotional distress and other damages, both compensatory and
punitive, for which he seeks compensation.

## JURY TRIAL REQUEST

352.     Plaintiff requests a trial by jury.

353.     WHEREFORE Plaintiff prays for judgement on each and every count in an
amount reasonably compensates for all damages, together with punitive damages,
interest, costs and an award of reasonable attorney fees and other litigation costs incurred
in the bringing of this action pursuant to 42 U.S.C. §1983, and/or §12131, and 5

M.R.S.A. § 4683, to the highest extent allowable by law, from the earliest time allowable

by lawn and grant such further relief as the Court may deem just and proper.


Dated this 25th day of February, 2024.          /s/ *Kristine C. Hanly*

                                                _____

                                                Kristine C. Hanly, Esq., Bar No. 4500
                                                Attorneys for Kerry Ross
                                                GARMEY LAW
                                                482 Congress Street, Suite 402
                                                Portland, ME 04101
                                                Tel: (207) 899-4644
                                                khanly@garmeylaw.com